THE CLEVELAND ELECTRIC ILLUMINATING CO., APPELLANT, v.
PUBLIC UTILITIES COMMISSION OF OHIO, APPELLEE.
(Two cases.)

[Cite as Cleveland Elec. Illuminating Co. v. Pub. Util.
Comm. (1976), 46 Ohio St. 2d 105.]

(Nos. 75-740 and 75-741—Decided May 5, 1976.)

106

Messrs. *Squire, Sanders & Dempsey,* Mr. *John Lansdale,* Mr. *Alan P. Buchmann,* Mr. *Richard A. Miller* and Mr. *Alan D. Wright,* for appellant.

Mr. *William J. Brown,* attorney general, Mr. *Charles S. Rawlings* and Ms. *Cheryl K. Hackman,* for appellee.

STERN, J. In *Gene Slagle, Inc.,* v. *Pub. Util. Comm., supra,* at page 46, it was held that when an order of the commission changing utility rates has been reversed by this court for failing to adequately set forth the reasons prompting the decision, "the increased rates pursuant to such order could no longer be lawfully charged, and those rates in effect prior to the above order were reinstated by operation of law, and continued in effect until further order of the commission." The utility raises two issues in this case: whether *Slagle* applies to this court's decision in *Cleveland Elec. Illuminating Co.* v. *Pub. Util. Comm.* (1975), 42 Ohio St. 2d 403, 330 N. E. 2d 1, and whether *Slagle* was erroneous and should be overruled. Since the utility raises substantial questions as to the correctness of *Slagle* itself, we find it appropriate to begin our consideration with that issue.

## I.

The difficulty presented in this case and in *Slagle* is that the statutory plan for public utility regulation set out in Title 49 of the Revised Code does not specifically prescribe the immediate effect upon existing rates of this court's reversal of a commission order revising rates; nor do the statutes prescribe a particular procedure to be followed.

The process of public utility rate-making in Ohio is wholly controlled by statute. Any public utility desiring to establish a rate or to change an existing rate must file a written application with the commission. R. C. 4909.18. The duty of the commission is to determine the justness

and reasonableness of the proposed rates, based upon the valuation of the utility's property, giving due regard to relevant factors such as the necessity for making reservations for surplus, depreciation and contingencies, and such other matters as are proper according to the facts of each case. R. C. 4909.15.

The process of rate-making frequently involves extensive hearings, voluminous testimony, and the determination of difficult and abstruse technical questions which must be resolved on the basis of complex and often disputed evidence. The function of the commission is to carry through this process, in accordance with the statutory plan, and to fix lawful and reasonable rates based upon the evidence presented.

The function and jurisdiction of this court in an appeal from an order of the commission is limited. Under R. C. 4903.13, our task is to affirm an order of the commission if it is not unreasonable or unlawful. This court has often emphasized the limited nature of that authority.[1]

Our function is not to weigh the evidence or to choose between alternative, fairly debatable rate structures. That would be to interfere with the jurisdiction and competence of the commission and to assume powers which this court is not suited to exercise. "* * * The members of this court are neither accountants nor engineers, and manifestly it would be unfair to the litigants and to the commission for the court to pretend that it is in a position to better evaluate the evidence and determine the difficult question of the reasonableness of the order than is the commission." *Dayton* v. *Pub. Util. Comm.* (1962), 174 Ohio St. 160, 162, 187 N. E. 2d 150. Our task is not to set rates; it is only to assure that the rates are not unlawful or unreasonable, and that the rate-making process itself is lawfully carried out.

---

[1]*E. g., Ohio Bus Line* v. *Pub. Util. Comm.* (1972), 29 Ohio St. 2d 222, 280 N. E. 2d 907; *Akron* v. *Pub. Util. Comm.* (1966), 5 Ohio St. 2d 237, 215 N. E. 2d 366; *Mt. Vernon Tel. Corp.* v. *Pub. Util. Comm.* (1955), 163 Ohio St. 381, 127 N. E. 2d 14; *Ohio Bell Tel. Co.* v. *Pub. Util. Comm.* (1951), 155 Ohio St. 526, 99 N. E. 2d 653; *Cincinnati* v. *Pub. Util. Comm.* (1950), 153 Ohio St. 56, 90 N. E. 2d 681.

In large measure, the purpose of the decision in *Slagle* was to affirm the limited nature of this court's jurisdiction in these types of cases. Our decision was that this court's reversal of a commission order rendered that order of no further legal effect. Upon a literal reading of the duties of this court under R. C. 4903.13, that decision is a logical result, for the statute directs that the order be "reversed, vacated or modified" if found to be unreasonable or unlawful.

The order which this court reversed in *General Telephone Co.* v. *Pub. Util. Comm.* (1972), 30 Ohio St. 2d 271, 285 N. E. 2d 34, and which was later at issue in *Slagle,* was an order which was defective because the commission had failed to carry out its statutory duty to provide adequate findings of fact and conclusions of law. This court could not modify the order without indulging in extensive examination of the record and improper speculation as to the actual basis for the decisions made by the commission, nor could this court determine that the order was based upon the evidence. Upon a literal reading of R. C. 4903.13, it would appear that this court might only reverse or vacate the order, in the sense of ending the order's legal effect, while leaving any subsequent proceedings for remedying defects in the order to the judgment of the commission.

In fact, however, upon further reflection and examination of Ohio's statutory plan for public utility regulation, and of the principles upon which this court's jurisdiction is based, we are now convinced that our decision in *Slagle* was in error and must be reversed. Several considerations compel this conclusion.

## I A.

The opinion of this court in *General Telephone* reversed the order of the commission,[2] and in *CEI, supra* (42 Ohio

---

[2] In *General Telephone*, the syllabus and opinion stated that the order was to be set aside. "Set aside" and "reverse" are, or course synonomous, both meaning to annul or make void. For example, "reverse" is defined in Black's Law Dictionary (4 ed.) as "to overthrow, vacate, *set aside*, make void, annul, repeal, or revoke * * *." (Emphasis added.)

St. 2d 403), we reversed in part and affirmed in part. In both cases, this court remanded the causes to the commission. .

To "remand" is to send a cause back to the original tribunal for further proceedings, generally upon orders or directions from the higher court. When a court acts to remand a cause, it is not itself finally determining the outcome of the cause, nor is it executing a judgment in favor of one of the parties.[a] The judgment is given legal effect when it is executed by the lower tribunal, and the judgment as rendered is that of the tribunal to which the cause had been remanded. *Carey* v. *Kemper* (1887), 45 Ohio St. 93, 11 N. E. 130. Since the effective, final judgment upon remand is that of the lower tribunal, it is manifest that this court's judgment does not take effect as a matter of law. In *Roberts* v. *Montgomery* (1927), 117 Ohio St. 400, 159 N. E. 475, this court was called upon to interpret Section 2 of

---

[a] For example, R. C. 2505.37 provides that:

"When a judgment or final order is reversed, in whole or part, in the * * * Supreme Court, the reviewing court shall render such judgment as the court below should have rendered, or remand the cause to that court for such judgment."

And, R. C. 2505.39 provides that:

"A court which reverses or affirms a judgment or final order upon appeal on questions of law, on which it pronounces judgment, shall not issue execution therein, but shall send a special mandate to the court below for execution thereon."

This latter statute by its terms applies to appeals from courts, and does not mention administrative agencies. However, R. C. Chapter 2505, which sets out the procedure on appeals, applies to "all proceedings whereby one court reviews or retries a cause determined by another court, an administrative officer, tribunal, or commission" (R. C. 2505.01[A]); and R. C. 2505.03 specifically provides that: .

"Every final order, judgment, or decree of a court and, when provided by law, the final order of any administrative officer, tribunal, or commission may be reviewed as provided in Sections 2505.04 to 2505.45, inclusive, of the Revised Code, unless otherwise provided by law. * * *"

Present R. C. Sections 2505.01, 2505.03, 2505.37, 2505.39, and 4903.13 were all enacted or reenacted in 1935, in an Act to Establish a Simplified Method of Appellate Review (116 Ohio Laws 104). This procedural scheme might arguably be held to apply to appeals from the commission, since no other procedure is provided by law, but that question is not directly presented here.

Article IV of the Constitution, which, then as now, confers the jurisdiction of this court in terms virtually identical to R. C. 4903.13, *i. e.*, jurisdiction to "review and affirm, modify, or reverse" the judgment. The court held, in paragraph one of the syllabus, that the authority of this court to remand is "* * * a necessary concomitant of the jurisdiction to review, affirm, modify, or reverse." That decision concerned an appeal from a Court of Appeals, but the same principle must apply here, since virtually identical jurisdictional language is involved. The holding in *Roberts* v. *Montgomery, supra*, necessarily affirms that this court has authority to remand causes to the commission.

That conclusion is also supported by other authority and by accepted practice.

In *Ford Motor Co.* v. *Labor Board* (1939), 305 U. S. 364, it was held that a federal Circuit Court of Appeals had inherent authority to remand a cause to a federal board, based upon statutory provisions for review similar to those at bar.[4] This court has also frequently recognized and exercised the authority to remand cases to administrative boards. In *Superior Metal Products* v. *Admr., Bur. of Employment Services* (1975), 41 Ohio St. 2d 143, 146, 324 N. E. 2d 179, it was stated: "This court holds that the power to reverse and vacate decisions necessarily includes the

---

[4]The statute in that case provided that "* * * the court * * * shall have the same exclusive jurisdiction to grant to the board such temporary relief or restraining order as it deems just and proper, and in like manner to make and enter a decree enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part the order of the board * * *." The court there stated, at page 373, that:

"It is familiar appellate practice to remand causes for further proceedings without deciding the merits, where justice demands that course in order that some defect in the record may be supplied. Such a remand may be made to permit further evidence to be taken or additional findings to be made upon essential points."

And, at page 374, the court stated that:

"The 'remand' does not encroach upon administrative functions. It means simply that the case is returned to the administrative body in order that it may take further action in accordance with the applicable law." (Citations omitted.)

power to remand the cause to the decision maker." The same principle has been applied to various other types of cases,[5] and has been applied as well in order to remand cases for further proceedings even without reversal of the decisions below. *McDowell* v. *State* (1929), 120 Ohio St. 613, 169 N. E. 299; *Young* v. *Schenck* (1856), 6 Ohio St. 110.

This court has impliedly recognized the existence of such authority in appeals from the commission on numerous occasions.[6] We have also specifically held that this court has the authority, and even in some cases the duty, to remand causes to the commission. In *East Ohio Gas Co.* v. *Pub. Util. Comm.* (1938), 133 Ohio St. 212, 12 N. E. 2d 765, paragraph thirteen of the syllabus states:

"Where the court determines that certain findings of the Public Utilities Commission are unreasonable and unlawful while others were properly made, and from the record the court is unable to substitute specific findings for those improperly made by the commission, it is the duty of the court to remand the proceedings to the commission, as a fact finding body, with instructions to carry out the rulings of the court and correct the findings which were found to be unreasonable and unlawful."

All of these considerations conclusively establish that this court does possess the authority to remand causes to the commission, as we did in both *General Telephone, supra* (30 Ohio St. 2d 271), and *CEI, supra.*

As was pointed out above, the effective judgment upon remand is the judgment of the lower tribunal. See R. C.

---

[5]*Orley* v. *Kosydar* (1974), 40 Ohio St. 2d 97, 321 N. E. 2d 238; *Fiddler* v. *Bd. of Tax Appeals* (1942), 140 Ohio St. 34, 42 N. E. 2d 151; *Neil* v. *Neil* (1883), 38 Ohio St. 558.

[6]*Motor Service Co.* v. *Pub. Util. Comm.* (1974), 39 Ohio St. 2d 5, 313 N. E. 2d 803; *Forest Hills Utility Co.* v. *Pub. Util. Comm.* (1974), 39 Ohio St. 2d 1, 313 N. E. 2d 801; *General Tel. Co.* v. *Pub. Util. Comm.* (1962), 173 Ohio St. 280, 181 N. E. 2d 698; *F. & R. Lazarus & Co.* v. *Pub. Util. Comm.* (1954), 162 Ohio St. 223, 122 N. E. 2d 783; *Elyria Tel. Co.* v. *Pub. Util. Comm.* (1953), 158 Ohio St. 441, 110 N. E. 2d 59; *Cincinnati* v. *Pub. Util. Comm.* (1922), 105 Ohio St. 181, 137 N. E. 36.

2505.37 and 2505.39. That principle applies to orders of the commission, and it therefore follows that the execution of this court's judgment of reversal and remand occurs only when the commission carries out the mandate of this court by its order and not, as held in *Slagle*, at the moment of this court's reversal by operation of law.

### I B.

In *Cincinnati & Suburban Bell Tel. Co. v. Pub. Util. Comm.* (1923), 107 Ohio St. 370, 140 N. E. 86, this court specifically held that the reversal and remand of a rate schedule did not act to automatically reinstate the rates theretofore in force. The court, at page 374, stated:

" * * * Therefore, when the order of the Public Utilities Commission was reversed by this court, and the cause remanded generally for further proceedings according to law, the cause came again before the Public Utilities Commission for the exercise by it of its judgment, and, if the record before it was not sufficient to enable it to intelligently exercise such judgment, it was its duty to either itself supplement that record or permit the parties interested to make such supplement, and then base its conclusion upon such record.' "

The circumstances of that case were unusual, as pointed out in *Slagle*. The reversal of the rate schedule was ordered without an accompanying majority opinion by the court. Nevertheless, the court did recognize the authority to remand cases to the commission, and recognized, as well, that the reversal and remand did not act to automatically reinstate the previous rate schedule.

A similar issue was presented in *Keco v. Cincinnati & Suburban Bell Tel. Co.* (1957), 166 Ohio St. 254, 141 N. E. 2d 465. In that case, the issue was whether an action for unjust enrichment lies to recover an increase in rates charged by a public utility under an order of the commis-

---

[7]The court in that case, by its order, also impliedly recognized that the reversal of an order of the commission could be by special mandate, the same procedure which is followed in reversing judgments of Courts of Appeals.

sion, where the order is subsequently reversed by the Supreme Court on the grounds that it is unreasonable and unlawful. The court, in *Keco*, held that an action for restitution did not lie. For the present purposes, it is significant to note the dates involved—the increase in rates was granted by an order dated May 28, 1953; on May 25, 1954, this court reversed and remanded the cause; and on June 4, 1954, the commission issued its order reducing the rates. The appellant sought restitution for the period from May 28, 1953 to June 4, 1954. Thus, this court's dismissal of the entire claim to a right of restitution necessarily held that the original rate order remained in effect during the period after this court's reversal and before the commission's new order.

The opinion in *Keco* did not specifically consider the moment at which this court's reversal and remand of a commission order takes effect, so that the case cannot be considered binding precedent on the issue herein. Nevertheless, that case and the *Cincinnati & Suburban Bell* case, *supra* (107 Ohio St. 370), are persuasive authority and are the only cases on point in Ohio.

### I C.

Most importantly, the holding in *Slagle* is incompatible with the statutory scheme for regulation of public utilities established by the General Assembly in Title 49 of the Revised Code.

The basic principle of Ohio's regulatory scheme for utility rates is that those rates are to be set by the commission upon hearings and evidence, and that only those rates which have been found to be fair and reasonable after such hearings may lawfully be charged. Utilities are protected by being assured a fair rate of return, while consumers are protected by being assured that service will be adequate and rates reasonable.

The rates fixed by order of the commission then go into effect immediately unless stayed by the filing of a bond during an appeal, and the order establishes the only rate which the utility may lawfully charge.

The basic argument in support of the position in *Slagle* is that when this court reverses a commission order approving a revised rate schedule, the order and the schedule are then no longer in effect. Therefore, it is argued that R. C. 4905.32 applies, which provides that:

"No public utility shall charge, demand, exact, receive, or collect a different rate, rental, toll, or charge for any service rendered, or to be rendered, than that applicable to such service as specified in its schedule filed with the Public Utilities Commission which is in effect at the time."

There are fundamental practical and statutory objections to that construction of the statute. The logical result of that argument would be that no rate could be charged, since this court had struck down the only rate schedule which was filed and in effect with the commission. That result would of course be manifestly unfair and perhaps disastrous for the unlucky utility. In other states, it has accordingly been held that the utility in such cases has a right to charge a reasonable rate. *Arizona Corp. Comm.* v. *Mountain States Tel. & Tel. Co.* (1951), 71 Ariz. 404, 228 P. 2d 749; *Southern Bell Tel. & Tel. Co.* v. *Georgia Pub. Serv. Comm.* (1948), 203 Ga. 832, 49 S. E. 2d 38; *Hutchinson* v. *Hutchinson Gas Co.* (1928), 125 Kan. 346, 264 P. 68; 73 Corpus Juris Secundum 1010.

Presumably, it was in order to prevent such an impermissibly burdensome result that *Slagle* adopted the principle that the effect of reversal was to reinstitute the rates charged by the utility before the order complained of. But those rates are ones the commission has rejected as unreasonable. That act might be based upon some legal fiction that the old rates are still constructively or presumptively filed. Yet, the practical effect is that this court would be directly ordering a utility to charge rates found to be unreasonable by the commission, rates which differ from those actually on file and which are only marginally and technically more defensible than any other past rate schedule.

The statutory framework for utility rate-making conflicts with such a holding. Various statutes require that

public utility rates "shall be just, reasonable, and not more than the charges allowed by law or by order of the Public Utilities Commission" (R. C. 4905.22); that a utility's rates shall not differ from those "specified in its schedule filed with the Public Utilities Commission which is in effect at the time" (R. C. 4905.32); and that if the utility "does or causes to be done, any act or thing * * * declared to be unlawful" it is liable in treble damages to the person, firm or corporation injured thereby (R. C. 4905.61).

The heart of this statutory plan is that the only proper rate is that set out in the approved rate schedule on file with the commission and open to public inspection, and that this schedule can be changed only by an order of the commission.

R. C. 4909.17 provides, in part, that:

"No rate, joint rate, toll, classification, charge, or rental, no change in any rate, joint rate, toll, classification, charge, or rental, and no regulation or practice affecting any rate, joint rate, toll, classification, charge, or rental of a public utility' shall become effective until the Public Utilities Commission, by order, determines it to be just and reasonable * * *."

Even more specific is R. C. 4909.15, which provides, in part, that after the commission has ordered that a new rate be substituted for an existing one " * * * no change in the rate, fare, toll, charge, rental, schedule, classification, or service, shall be made, rendered, charged, demanded, exacted, or changed by such public utility without the order of the commission, and any other rate, fare, toll, charge, rental, classification, or service is prohibited."

For this court to require, upon penalty of treble damages, that a public utility change its rates before the commission itself has ordered a change, would be to require the utility to directly violate R. C. 4909.15.

No such result was intended by the General Assembly in its delineation of the authorities of the commission and of this court. Rather, the statutes make clear that public utilities are required to charge the rates and fees stated in the schedules filed with the commission pursuant to the

commission's orders; that the schedule remains in effect until replaced by a further order of the commission; that this court's reversal and remand of an order of the commission does not change or replace the schedule as a matter of law, but is a mandate to the commission to issue a new order which replaces the reversed order; and that a rate schedule filed with the commission remains in effect until the commission executes this court's mandate by an appropriate order. This holding is consistent with the basis of this court's jurisdiction, with precedent and established practice, and with the statutory framework for public utility rate-making.

## I D.

The difficulty which today's holding does pose is that the customers of public utilities may be charged a rate found by this court to be unreasonable or unlawful during the period preceding the execution of this court's mandate by an order of the commission. There are a number of answers to this difficulty.

First, the "unfairness" is often merely technical or wholly illusory. In both *General Telephone* and *CEI, supra,* it was the utility which appealed the rate orders. In the former case, the order was found by this court to be technically insufficient, but upon remand the commission reinstituted exactly the same rates which it had originally found reasonable. *Slagle, supra.* There is no apparent unfairness in charging that same rate in the brief interim period. In *CEI,* this court found that the rates granted were too low, so that any delay in adopting a new rate schedule would tend to continue rates which this court had found to be unreasonably low. If there is any unfairness in this, it is to the utility and not to the consumers.

Second, even in cases where this court finds that rates should be reduced, the commission has a clear responsibility to do this promptly. If it becomes apparent that there will be a long delay in establishing new rates, the commission also has authority to temporarily alter rates under the emergency powers of R. C. 4909.16.

Third, the practical problems of administering rate

hearings and appeals therefrom necessarily cause delays, and there is simply no way that an immediate and perfect modification of utility rates can be achieved. The language quoted with approval in *Keco, supra* (166 Ohio St.), at page 259, applies with equal force in this case:

"It may seem inequitable to permit the defendant to retain the difference in the rates collected under the May 28, 1953, order of the commission and the rates finally fixed by the commission on June 4, 1954, but absolute equity in a particular case must sometimes give way to the greater overall good. In adopting a comprehensive scheme of public utility rate regulation, the Legislature has found it impossible to do absolute justice under all circumstances. For example, under present statutes a utility may not charge increased rates during proceedings before the commission seeking same and losses sustained thereby may not be recouped. Likewise, a consumer is not entitled to a refund of excessive rates paid during proceedings before the commission seeking a reduction in rates. Thus, while keeping its broad objectives in mind, the Legislature has attempted to keep the equities between the utility and the consumer in balance but has not found it possible to do absolute equity in every conceivable situation."

II.

As mentioned above, appellant has urged that the present case is distinguishable from *Slagle,* because in that case the entire order of the commission was struck down for failing to comply with the statutory requirements as to the form of an order, whereas in this case the order was formally sufficient, but was reversed in part because this court found that some of the commission's findings were unreasonable and unlawful. That distinction would have the paradoxical effect of permitting a utility to charge rates after this court had in fact found them to be unreasonable and unlawful, but, under *Slagle,* of forbidding the utility to charge rates which the commission had found to be reasonable and which this court had not actually even considered. In any event, since we find that the rule itself is faulty,

we need not further consider whether an exception to it should be adopted.

We also need not address the constitutional issues raised by the appellants.[8]

## III.

We hold that the rates in effect for appellant prior to the commission's November 28, 1973, opinion and order were not reinstated by operation of law when this court reversed that order in part. The June 16, 1975, order of the commission, which so held, is unlawful and it is therefore reversed.

*Order reversed.*

O'NEILL, C. J., W. BROWN and P. BROWN, JJ., concur.

HERBERT, J., concurs in the syllabus and the judgment only.

CORRIGAN, J., concurs in paragraph two of the syllabus and in the judgment.

CELEBREZZE, J., concurs in paragraph one of the syllabus only.

HERBERT, J., concurring in syllabus and judgment. I do not now quarrel with the first paragraph of the syllabus, although I have doubts that it is necessary to a resolution of this cause. I view the second paragraph of the syllabus as a presently needed declaration of the legal principle suggested by the practical effect of *Keco Industries* v. *Cincinnati & Suburban Bell Tel. Co.* (1957), 166 Ohio St. 254. As noted below, this principle was not carried into the *Keco* syllabus.

*Keco* arose because, on May 28, 1953, the utility in that

---

[8]This opinion has been a lengthy one. Its intent was to make fully clear why this court today overrules an opinion rendered without dissent only a year ago. This court is more accustomed to detecting and correcting the errors of others than its own. It is to be hoped that we will always remain willing to correct them whether found in either place.

120

case was awarded a rate increase by the commission and the city appealed to this court. (*Cincinnati* v. *Pub. Util. Comm.* [1954], 161 Ohio St. 395.) Finding the increase to be unreasonable and unlawful, the court reversed the order setting new rates and, on May 25, 1954, the cause was remanded to the commission for further proceedings. On June 4, 1954, the commission ordered the rates reduced. Subsequent thereto, Keco Industries sued the utility, alleging that the latter had been unjustly enriched by the amount of the rate increase charged between May 28, 1953, and June 4, 1954.

Paragraph two of the *Keco* syllabus states:

"Where the charges collected by a public utility are based upon rates which have been established by an order of the Public Utilities Commission of Ohio, the fact that such order is subsequently found to be unreasonable or unlawful on appeal to the Supreme Court of Ohio, in the absence of a statute providing therefor, affords no right of action for restitution of the increase in charges collected during the pendency of the appeal."

It is clear to me that the above words, "pendency of the appeal," refer to the preceding phrase, "appeal to the Supreme Court of Ohio." Throughout the opinion, Judge Matthias leaves no doubt of his intention in this regard. At page 258, the opinion states:

"In the present case we have rates which were established by the proper designated authority after a hearing and consideration in full compliance with the law, and, *until such time as they were set aside by the Supreme Court,* they were, in the absence of a stay, the lawful rates and the *only* ones which could be collected by the utility." (Emphasis added in part.)

And, again, at page 259:

"From the above consideration it is our conclusion that the rates of a public utility in Ohio are subject to a general statutory plan of regulation and collection; that any rates set by the Public Utilities Commission are the lawful rates until *such time as they are set aside* as being

unreasonable and unlawful *by the Supreme Court * * *.*" (Emphasis added.)

It would seem logical that an appeal to this court is concluded when an entry of judgment is entered here, or, with more certainty, when an order of remand is issued and the mandate of the court is officially entered upon the record. However, as described in *Keco*, this court issued its mandate on May 25, 1954, and the commission's responding order was not entered until June 4.

If the appeal to this court was no longer pending after May 25, logic would dictate that the increase in rates charged during the above ten-day period would have fallen outside both the syllabus and the opinion in the case. However, the court's final judgment denied restitution for the entire period sought.

When this court decided *Gene Slagle, Inc.,* v. *Pub. Util. Comm.* (1975), 41 Ohio St. 2d 44, *Keco* was the only Ohio precedent from which guidance was available.[9] A reading of both the opinion and syllabus of *Keco* left open the question of the status of a PUCO order which has been reversed by this court as unlawful and unreasonable, and which has not been supplanted with a subsequent order from that agency. As a pure legal issue, *Slagle* filled that void in a manner which seemed as natural as night following day—when a PUCO order is finally reversed, it simply has no further effect in law; and the relative positions of parties which had been altered by the order reverted, from the time of reversal to the time of a new order, to that which existed in the absence of the order. At the time *Keco* was announced, such a conclusion was not only logical, it was also practical.

Unfortunately, the same does not obtain today. The logic of the premise remains, but its practicality has dissolved under a mountain of delay, occassioned by a deluge

---

[9]I remain convinced that *Cincinnati & Suburban Bell Tel. Co.* v. *Pub. Util. Comm.* (1923), 107 Ohio St. 370, could not reasonably have provided a precedent for deciding the issue involved in *Slagle*, nor is it of value to us in the instant cause.

of filings in an agency which must do its best to cope with the 70's while statutorily geared for the 40's.

In *Keco*, as heretofore noted, only ten days elapsed between this court's mandate and the responding PUCO order. Eighteen years later, as illustrated in *Slagle*, the period of time between this court's mandate and the agency order had ballooned to 85 days.

As I now view it, our error in *Slagle* was not in announcing an invalid principle of law, it was in our understandable unwillingness to accept, as inevitable, the inordinate delays now associated with important PUCO decisions. Hence, the instant syllabus and judgment represent the acceptance of, and a necessary response to, reality.

As a regulated monopoly, appellant's production and marketing of its product rests mainly in the hands of the legislative branch of our state government. This is so with all public utilities in Ohio. Equally entrusted to the General Assembly is an obligation to protect the interests of the consumer of the utility's product. It has long been recognized that balancing these often competing and always vital concerns is a serious and demanding responsibility, the totally satisfactory execution of which has been elusive to some of the best minds of our times.

As stated by the trial judge in *Keco*, "* * * the Legislature has attempted to keep the equities between the utility and the consumer in balance but has not found it possible to do absolute equity in every conceivable situation." Apparently, the viability of that observation has not diminished with time. Hopefully, however, the search continues for a permissible result which will put it to permanent rest.

As heretofore stated, the somewhat paradoxical conclusion that a reversed PUCO order remains efficacious in the absence of a concomitant stay of its execution results, in my opinion, from a recognition of extant exigency. At the heart of this determination, however, would seem to be the thought that R. C. 4903.13 withholds from this court the power to remand a cause to the PUCO, for its further

consideration, in the absence of an accompanying reversal, vacation or modification. Were it not so, the outcome in *General Telephone Co.* v. *Pub. Util. Comm.* (1972), 30 Ohio St. 2d 271, *Slagle,* and the instant cause below could have been different, and the litigatory thrashings about which have ensued as a result of those cases could have easily been avoided.

My suggestion in this regard should not be interpreted as an advocacy of advisory opinion writing, as I doubt that such a drastic alteration of the traditional posture of the Ohio Judiciary would, or could, necessarily follow from a utilization of the above procedure. As a matter of fact, this court has already employed the method in at least two cases, both of which concerned an area of the law involving the same basic derivative jurisdiction as does the cause at bar. See *B. F. Keith Columbus Co.* v. *Bd. of Revision* (1947), 148 Ohio St. 253, 74 N. E. 2d 359; *T. F. Scholes, Inc.,* v. *Bowers* (1956), 166 Ohio St. 67, 139 N. E. 2d 7; R. C. 5717.-04; R. C. 4903.13; Section 2 of Article IV of the Constitution of Ohio (as amended November 7, 1944); Section 2 (B) (2) (c) of Article IV of the Constitution of Ohio (as amended May 7, 1968). It has yet to be suggested that the court's disposition of those two appeals, under their facts, was anything but permissible, appropriate and efficient.

In the field of public utility law, there exists a constitutionally recognized need for broad cooperation between this court and the agency whose heavy burden it is to execute its statutory function as expeditiously as possible. The presence of authority in this court to remand without reversal may now be worthy of serious consideration. Perhaps it would constitute a worthwhile contribution to the efficiency so sorely needed and diligently pursued by many in state government today.